IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

_____
                                        )
BARBARA FISHER,                         )
                                        )
            Plaintiff,                  )
                                        )
        and                             )
                                        )
UNITED STATES OF AMERICA,               )   Civil Action No.
                                        )     3:04 CV 00418
                                        )
            Plaintiff-Intervenor,       )
                                        )
        v.                              )
                                        )
PERMA-FIX OF DAYTON, INC.               )
                                        )
            Defendant.                  )
                                        )
_____)

UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America, by the authority of the Attorney General and through its undersigned attorneys, acting at the request of and on the behalf of the Administrator of the United States Environmental Protection Agency ("U.S. EPA"), alleges as follows:

NATURE OF ACTION

1.   The United States files this Complaint in Intervention in this citizen's suit brought under Section 304 of the Clean Air Act, as amended ("CAA" or the "Act"), 42 U.S.C. § 7604.

Pursuant to Section 304(c)(2) of the Act, 42 U.S.C. § 7604(c)(2), the Administrator of U.S. EPA may intervene as a matter of right at any time in a CAA citizen's suit.

2.     The United States seeks injunctive relief and civil penalties against Perma-Fix of Dayton, Inc. ("Perma-Fix") for violations of the Act, the National Emission Standards for Hazardous Air Pollutants "(NESHAP")for Off-Site Waste Recovery Operations (the "OSWRO regulations") codified at 40 C.F.R. Part 63, Subpart DD; the general NESHAP regulations at 40 C.F.R. Part 63, Subpart A; the State Operating Permit Program regulations at 40 C.F.R. Part 70; and provisions in the federally enforceable Ohio State Implementation Plan ("SIP") adopted pursuant to Section 110 of the Act, 42 U.S.C. § 7410.  The violations alleged herein occurred or are occurring at Perma-Fix's industrial waste processing facility in Dayton, Ohio.

<u>JURISDICTION, VENUE AND AUTHORITY</u>

3.     This Court has jurisdiction of the subject matter of this action pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345 and 1355.

4.     Venue is proper in this district pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because the violations alleged herein occurred in or are occurring at Perma-Fix's Dayton, Ohio facility which is located within this district and because Perma-

- 2 -

Fix resides within this judicial district.

5.    The Attorney General is authorized to bring this action pursuant to Sections 113(b) and 305 of the Act, 42 U.S.C. §§ 7413(b) and 7605, and 28 U.S.C. §§ 516 and 519.

## NOTICES

6.    The United States has provided notice of this action to the Ohio Environmental Protection Agency ("OEPA"), in accordance with Section 113(b) of the Act, 42 U.S.C. § 7413(b).

7.    Pursuant to Section 113(a)(1) of the Act, 42 U.S.C. § 7413(a)(1), on March 15, 2006 U.S. EPA issued a written Notice of Violation ("NOV") to Perma-Fix advising the company that it violated and was in violation of relevant requirements of the Ohio SIP.

## DEFENDANT

8.    Defendant Perma-Fix of Dayton, Inc. is a corporation organized under the laws of the State of Ohio. Perma-Fix owns and operates an industrial facility located at 300 South West End Avenue in Dayton, Ohio (the "Facility"), at which it processes and treats industrial wastewaters, used oil and hazardous and non-hazardous waste received from off-site sources. At the Dayton Facility, Perma-Fix owns and operates, among other things, a biological treatment plant (the "Bioplant") that uses micro-organisms to oxidize contaminants in wastewater into more benign compounds before the wastewater is discharged into an

adjacent publicly-owned wastewater treatment plant.

<u>STATUTORY AND REGULATORY BACKGROUND</u>

9. The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population. Section 101(b)(1) of the CAA, 42 U.S.C. § 7401(b)(1).

10. Section 112(d) of the Act as amended, 42 U.S.C. § 7412(d), directs U.S. EPA to promulgate regulations establishing emission standards for categories or subcategories of major sources of hazardous air pollutants ("HAPs").

11. As amended, Section 112(a) of the Act, 42 U.S.C. § 7412(a), defines "major source" to mean any stationary source (or group of sources located in a contiguous area and under common control) that emits or has the potential to emit, in the aggregate, 10 tons per year or more of any hazardous air pollutant, as such pollutants are listed pursuant to Section 112(b) of the Act, or 25 tons per year or more of any combination of HAPs.

<u>The OSWRO NESHAP Regulations</u>

12. On July 1, 1996, U.S. EPA promulgated National Emission Standards for Hazardous Air Pollutants ("NESHAP")for Off-Site Waste Recovery Operations ("OSWRO"), 61 Fed. Reg. 34140. Amended OSWRO NESHAP regulations were promulgated on July 20,

1999, 64 Fed. Reg. 38950.  The OSWRO regulations are codified at 40 C.F.R. Part 63, Subpart DD.

13.  Pursuant to 40 C.F.R. § 63.680(a), the OSWRO regulations apply to owners and operators of any plant site that is a "major source" of "hazardous air pollutants" and that receives off-site material such as wastewater, used oil or used solvents for processing in one of the waste management or recovery operations listed in 40 C.F.R. § 63.680 (a)(2)(i)through (vi).

14.  The OSWRO NESHAP regulation at 40 C.F.R. § 63.680(a)(1) defines "major source" by reference to the general NESHAP definition at 40 C.F.R. § 63.2, which tracks the statutory definition in Section 112(a) of the Act, 42 U.S.C. § 7412(a). "Hazardous air pollutants" covered by the NESHAP are listed in Table 1 of the OSWRO regulations and include, without limitation, xylene, styrene, toluene, methyl ethyl ketone, and benzene.

15.  Waste management or recovery operations in 40 C.F.R. § 63.680 (a)(2)(i) through (vi) include certain hazardous waste handling and used oil recycling operations, as well as wastewater treatment operations where the treatment of wastewater received from off-site sources is a predominant activity at the site and the operation is also regulated under the Clean Water Act.

16.  The OSWRO regulations define "affected sources"

in 40 C.F.R. § 63.680(c) to include the entire group of "off-site material management units" that are associated with an operation covered by 40 C.F.R. § 63.680 (a)(2)(i) through (vi).

17.  Pursuant to 40 C.F.R. §§ 63.6(b) and 63.680(e)(2), the date for compliance with the OSWRO NESHAP for a new affected source that commenced construction after October 13, 1994 is the date of initial startup of the new operation or July 1, 1996, whichever is later.

18.  Pursuant to 40 C.F.R. § 63.6(c)(5), existing sources which become affected sources by reason of the new operation have three years and seven months from the date of startup of the new operation within which to comply with the NESHAP.  61 Fed. Reg. 34140, 34159 (July 1, 1996); 64 Fed. Reg. 38950, 38952 (July 20, 1999).

19.  Owners and operators of affected sources must control air emissions from each off-site material management unit in accordance with the standards specified in the OSWRO regulations at 40 C.F.R. §§ 63.685 through 63.689.

20.  The OSWRO regulations at 40 C.F.R. § 63.685(b) establish emission control requirements for tanks that are part of off-site material management units.  Tanks must meet either Level 1 or Level 2 control requirements, depending on the tank's size and the off-site material's maximum hazardous air pollutant vapor pressure.  40 C.F.R. §§ 63.685(c)(1) and 63.694(j) describe

procedures to be used to determine maximum hazardous air pollutant vapor pressure for off-site material managed in tanks. Level 1 controls for tanks are prescribed in 40 C.F.R. § 63.685(c); Level 2 controls are prescribed in 40 C.F.R. § 63.685(d).

21.  40 C.F.R. § 63.693(f)(2) requires owners or operators using a vapor incinerator (also known as a thermal oxidizer) as a control device to perform an initial performance test or design analysis to demonstrate that the vapor incinerator achieves the performance requirements in 40 C.F.R. § 63.693(f)(1).

22.  The OSWRO regulation at 40 C.F.R. § 63.689(c) applies to "transfer systems" and requires the owner or operator of such systems to control emissions by using one of the transfer systems specified in 40 C.F.R. § 63.689(c)(1) through (c)(3).

23.  40 C.F.R. § 63.695(c)(1)(i) provides that owners or operators required to operate closed vent systems as part of their Level 1 or 2 controls must monitor the system's components and connections at initial startup and each year thereafter to demonstrate that the system operates with no detectable organic emissions.

24.  40 C.F.R. § 63.695(e) provides that owners and operators of control devices required under 40 C.F.R. § 63.693 must monitor such devices in accordance with the requirements of

40 C.F.R. § 63.695(e)(1) through (e)(7).

25.   40 C.F.R. § 63.695(e)(2) provides that owners and operators of control devices required under 40 C.F.R. § 63.693 must calculate and record daily average values for each monitored operating parameter associated with that control device.

26.   The OSWRO NESHAP contains various recordkeeping and reporting provisions, including, but not limited to, require-ments in 40 C.F.R. §§ 63.696(g), 63.697(a)(2) and 63.697(b)(4).

The General NESHAP Regulations

27.   Pursuant to Table 2 of the OSWRO NESHAP, certain provisions of the general NESHAP regulation at 40 C.F.R. Part 63, Subpart A are made applicable to sources covered by the OSWRO NESHAP.

28.   40 C.F.R § 63.5(b)(3) of the general NESHAP regulations, which is applicable to sources covered by the OSWRO NESHAP, provides that no person may construct a new source that causes the facility to become a major source subject to a NESHAP standard without obtaining written approval in advance from the U.S EPA Administrator.

29.   40 C.F.R. § 63.6(e)(3), which is also applicable to sources covered by the OSWRO regulations, requires the owner or operator of the source to develop and implement a Startup, Shutdown and Malfunction Plan ("SSM Plan") that describes procedures for operating and maintaining the source, including a

corrective action plan for malfunctioning process, control and monitoring equipment used to comply with a relevant standard.

30.  40 C.F.R. § 63.10(b)(2)(i), which is also applicable to sources covered by the OSWRO regulations, requires the owner or operator to keep records of the occurrence and duration of each startup, shutdown and malfunction of its process equipment.

31.  40 C.F.R. § 63.10(b)(2)(ii), which is also applicable to sources covered by the OSWRO regulations, requires the owner or operator to keep records of the occurrence and duration of each malfunction of required control equipment.

32.  40 C.F.R. § 63.10(b)(2)(vi), which is also applicable to sources covered by the OSWRO regulations, requires the owner or operator to keep records of each period during which a continuous monitoring system (CMS) is malfunctioning or inoperative.

The Title V Permit Regulations

33.  Section 502(b) of the Act, 42 U.S.C. § 7661a(b), required the Administrator of U.S. EPA to promulgate regulations establishing the minimum elements of a Title V permit program to be administered by any air pollution control agency, including the elements specified in 42 U.S.C. Sections 502(b)(1) through (10) of the Act, 42 U.S.C. § 7661a(b)(1) through (10).

34.  In accordance with 42 U.S.C. § 7661a(b), U.S. EPA

has promulgated State Operating Permit Program regulations, which are codified at 40 C.F.R. Part 70.

35.   40 C.F.R. § 70.5 requires owners or operators of major sources to submit timely and complete applications for Title V permits.   40 C.F.R. § 70.7(b) prohibits such owners or operators from operating until an application for a Title V permit has been submitted.

36.   Section 502(d) of the Act, 42 U.S.C § 7661a(d) required the Governor of each State to develop and submit to the Administrator of EPA for approval a permit program meeting the requirements of 42 U.S.C. § 7661a(b)(1) through (10).

37.   Ohio submitted a Title V permit program to the Administrator, which was approved on August 15, 1995.   60 Fed. Reg. 42045.

38.   Pursuant to Section 502(a) of the Act, 42 U.S.C. § 7661a(a), after the effective date of any State's Title V permit program approved by U.S EPA, it is unlawful to operate a major source in such State except in compliance with a Title V permit.

The State Implementation Plan

39.   Section 110 of the Act, 42 U.S.C. § 7410, requires each State to adopt and submit to U.S. EPA for approval a State Implementation Plan ("SIP") which, inter alia, includes a permit program to regulate the construction and modification of any

stationary source of air pollution as necessary to assure that National Ambient Air Quality Standards are achieved.  Pursuant to Section 113(a) and (b) of the Act, 42 U.S.C. § 7413(a) and (b), upon approval by U.S. EPA, SIP requirements are federally enforceable under Section 113.  See 40 C.F.R. § 52.23.

40.  Pursuant to Section 110 of the Act, 42 U.S.C. § 7410, on October 31, 1980, U.S. EPA approved Ohio Administrative Code ("Ohio Admin. Code") Chapter 3745-31 as part of the federally enforceable SIP for Ohio. See 45 Fed. Reg. 72119. Since then, U.S. EPA has approved several revisions to Chapter 3745-31 which regulates Permits to Install("PTI") new or modified sources of air pollutants.  Ohio Admin. Code Chapter 3745-31 was substantially revised and approved as a revision to the SIP on September 8, 1993. See 58 Fed. Reg. 47211.

41.  Ohio Admin. Code § 3745-31-02(A) states that no person shall cause, permit or allow the installation of a new source of air pollutants or allow the modification of an air contaminant source without first obtaining a Permit to Install the new source from the director of the Ohio Environmental Protection Agency ("Ohio EPA").

42. Ohio Admin. Code § 3745-31-05(A)(3) provides that the director of the Ohio EPA shall issue a PTI only if the director determines that the installation or modification and operation of the air contaminant source will employ best avail-

able technology ("BAT").

Information Requests Under Section 114 of the Act

43. Section 114(a) of the Act, 42 U.S.C. § 7414(a), authorizes the Administrator of U.S. EPA to require persons who own or operate emission sources to provide such information as the Administrator may reasonably require for purposes of determining compliance with the Act.

44. Section 113(b) of the Act, 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for a permanent or temporary injunction when a person is in violation of any requirement or prohibition in the CAA or in any applicable standard, implementation plan or permit. Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and 69 Fed. Reg. 7121 (February 13, 2004), persons who violate the Act or an applicable standard, plan or permit are liable for a civil penalty of up to $27,500 per day for violations occurring between January 30, 1997 through March 15, 2004 and $32,500 per day for violations occurring after March 15, 2004.

GENERAL ALLEGATIONS

45. Perma-Fix is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

- 12 -

46. Perma-Fix is an "owner" and "operator" of the Dayton Facility, which is a "major source" of HAPs and includes "affected sources" as those terms are defined in Sections 112, 113(b), 302 and 501 of the Act, 42 U.S.C. §§ 7412, 7413, 7602 and 7661, and C.F.R. §§ 63.2, 63.680(c) and 70.2.

47. At all times relevant to this Complaint, Perma-Fix received industrial wastewater, used oil and other hazardous and non-hazardous waste from off-site sources and conducted various of the waste management and recovery operations listed in 40 C.F.R. § 63.680(a)(2)(i) through (vi).

48. Perma-Fix commenced construction of the Bioplant at its Dayton Facility in 2000 and started up operation of the Bioplant on or about November 17, 2000. The initial Bioplant operation included off-site material management units (tanks) T-801D, T-801E, a Biological Sequential Batch Reactor ("BioSBR"), a Biological Variable Depth Reactor ("BioVDR"), and an Activated Sludge and Utility Clarifier. Tanks 801D, 801E and the Activated Sludge and Clarifier tanks were taken out of service in April 2001 and June 2002, respectively. Tanks 901A, 901B and 901C were added as part of a Bioplant expansion in November 2001.

49. Since startup of the Bioplant operation on November 17, 2000, the offsite material management units at the Perma-Fix Facility have had a potential to emit greater than 25 tons per year ("TPY")of hazardous air pollutants.

50.   Upon startup of the Bioplant, the Perma-Fix Facility became a "major source" of hazardous air pollutants as that term is defined in Section 112(a) of the Act, 42 U.S.C. § 7412(a) and the regulations at 40 C.F.R.§ 63.680(a)(1) and 40 C.F.R. §§ 63.2 and 70.2.

51.   Pursuant to 40 C.F.R. § 63.6(b), Bioplant units T-801D, T-801E, the BioSBR, the BioVDR and the Activated Sludge and Utility Clarifier were required to comply with the OSWRO NESHAP regulations at the time of startup of these units on or about November 17, 2000.

52.   Pursuant to 40 C.F.R § 63.6(b), Bioplant tanks 901A, 901B and 901C were required to comply with the OSWRO regulations at the time of startup of these units in November 2001.

53.   Before and after startup of the Bioplant, Perma-Fix operated other wastewater treatment equipment, a used oil recovery operation and a hazardous waste handling (fuel bulking) operation at its Dayton Facility.  These operations are "affected sources" as defined in 40 C.F.R. § 63.680.

54.   Perma-Fix has maintained and continues to maintain certain of the foregoing used oil and wastewater operations in Building B and certain of the foregoing wastewater and solid waste operations in Building G at its facility, among other operations.  Pursuant to 40 C.F.R. § 63.6(c)(5), the compliance

- 14 -

date for these existing sources was June 17, 2004, which was three years and seven months after startup of the Bioplant.  See 61 Fed. Reg. 34140, 34159 (July 1, 1996); 64 Fed. Reg. 38950, 38953 (July 20, 1999).

55.  Perma-Fix has also owned and operated a transfer system as part of its hazardous waste management operation. The OSWRO NESHAP compliance date for this existing source is also June 17, 2004.  The system, which involves pumping hazardous waste from tanks and drums into tanker trucks, is subject to regulation under 40 C.F.R. § 689(c)(2).

56.  Perma-Fix began construction of a regenerative thermal oxidizer in August 2002.  This unit, which began operation on November 6, 2002, is a vapor incinerator that controls emissions from Bioplant tanks BioSBR and BioVDR, among other units.  At the same time, a closed vent system was installed between the vapor incinerator and the BioSBR and BioVDR tanks, to control emissions from these units.

57.  Perma-Fix became obligated to comply with the maintenance, recordkeeping and reporting requirements relating to the vapor incinerator (thermal oxidizer) upon startup of this equipment in November 2002.

<u>FIRST CLAIM FOR RELIEF</u>
(Violations of the OSWRO NESHAP Regulations)

58.  The allegations in Paragraphs 1 through 57 are realleged and incorporated herein by reference.

- 15 -

59. From November 2000 to at least July 2005, Perma-Fix failed to determine the maximum hazardous vapor pressure of its off-site material in Bioplant tanks, in violation of 40 C.F.R. § 63.685(c)(1).

60. From November 2000 to April 2001, Perma-Fix failed to control emissions from Bioplant tanks T-801D and T-801E, in violation of 40 C.F.R. § 63.685(c)(2).

61. From November 2000 to November 2002 when the regenerative thermal oxidizer began operation, Perma-Fix failed to control emissions from the Bioplant Activated Sludge and Utility Clarifier tanks, in violation of 40 C.F.R. § 63.685(c)(2).

62. From November 2001 to at least July 2004 when conservation vents were installed on these tanks, Perma-Fix failed to control emissions from Bioplant tanks T-901A, T901B and T901C, in violation of 40 C.F.R. § 63.685(c)(2).

63. From November 2000 to at least November 2002, Perma-Fix failed to control emissions from Bioplant tanks BioSBR and Bio VDR, in violation of 40 C.F.R. § 63.685(c)(2).

64. From June 2004 to at least July 2005, Perma-Fix failed to control emissions from various wastewater treatment and oil recovery tanks, including, without limitation, used oil tanks T1, T2, G1, G2, T808 and the oil/water separator.

65. From June 2004 to at least July 2005, Perma-Fix

failed to control emissions from management units associated with its hazardous waste transfer operation, in violation of 40 C.F.R. § 63.689(c)(2).

66. From January 30, 2001 to at least July 2005, Perma-Fix failed to submit startup, shutdown and maintenance ("SSM")reports for each affected source on a semi-annual basis, in violation of 40 C.F.R. § 63.697(a)(2).

67. From November 2002 to at least July 2005, Perma-Fix failed to perform an initial performance test or design analysis on its vapor incinerator, in violation of 40 C.F.R. § 63.693(f)(2).

68. From November 2002 to March 2004 and from March 2005 to at least July 2005, Perma-Fix failed to monitor its closed vent system to demonstrate that the system operated with no detectable emissions, in violation of 40 C.F.R. § 63.695(c)(1)(i) and (ii).

69. From November 2002 to at least July 2005, Perma-Fix failed to calculate daily average values for each monitored operating parameter (of its thermal oxidizer), in violation of 40 C.F.R. § 63.695(e)(2).

70. From at least June 2003 to at least July 2005, Perma-Fix failed to submit semi-annual reports summarizing excursions as defined in § 695(e)(4), in violation of 40 C.F.R. § 63.697(b)(4).

71.   From November 2002 to at least July 2005, Perma-Fix failed to record descriptions of planned routine maintenance operations that would cause a control device (here the thermal oxidizer) not to meet applicable requirements, in violation of 40 C.F.R. § 63.696(g).

72.   Unless restrained by an order of this Court pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Perma-Fix will continue to violate applicable provisions of the OSWRO NESHAP at its Dayton Facility.

73.   Pursuant to Section 113(b) of the Act and the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, Perma-Fix is subject to civil penalties for each violation in the preceding paragraphs occurring within five years before the date of filing of this Complaint.  Penalties for such violations are up to $27,500 per day through March 15, 2004 and up to $32,500 per day for each violation after March 15, 2004.

SECOND CLAIM FOR RELIEF
(Violations of the General NESHAP Regulations)

74.   The allegations in paragraphs 1 through 57 are realleged and incorporated herein by reference.

75.   Perma-Fix failed to obtain prior written approval from the Administrator of U.S. EPA prior to constructing the Bioplant, in violation of 40 C.F.R. § 63.5(b)(3).

76.   From November 2000 to at least July 2005, Perma-

- 18 -

Fix failed to develop and implement an SSM Plan that describes operating and maintenance procedures for each of its affected sources, in violation of 40 C.F.R. § 63.6(e)(3).

77.  From November 2000 to at least July 2005, Perma-Fix failed to keep records of the occurrence and duration of of each startup, shutdown and malfunction of its process equipment, in violation of 40 C.F.R. § 63.10(b)(2)(i).

78.  From November 2002 to at least July 2005, Perma-Fix failed to keep records of the occurrence and duration of each startup, shutdown and malfunction of required control and monitoring equipment, in violation of 40 C.F.R. § 63.10(b)(2)(ii).

79.  From November 2002 to at least July 2005, Perma-Fix failed to keep records of each period when its CMS was malfunctioning or inoperative, in violation of 40 C.F.R. § 63.10(b)(2)(vi)

80.  Unless restrained by an order of this Court pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), Perma-Fix will continue to violate applicable provisions of the General NESHAP regulations at its Dayton facility.

81.  Pursuant to Section 113(b) of the Act and 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, Perma-Fix is subject to civil penalties for each violation in the preceding paragraphs occurring within five years before the date of filing of this Complaint.  Penalties for such violations are up to

$27,500 per day through March 15, 2004 and $32,500 per day for each violation after March 15, 2004.

THIRD CLAIM FOR RELIEF
(Title V Permit)

82.  The allegations in paragraphs 1 through 57 are realleged and incorporated herein by reference.

83.  From November 2000 to the present time, Perma-Fix failed to submit an application for and operated a major source without a Title V permit, in violation of Section 502(a) of the Act, 42 U.S.C. § 7661a, and 40 C.F.R. §§ 70.5(a) and 70.7(b), and Ohio Admin. Code Chapter 3745-77.

84.  Unless restrained by an order of this Court pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Perma-Fix will continue to violate the foregoing provisions of the Act and the regulations.

85.  Pursuant to Section 113(b) of the Act, Perma-Fix is subject to civil penalties for violations of the foregoing provisions occurring within five years before filing of this Complaint. Penalties for such violations are up to $27,500 per day for violations occurring before March 15, 2004 and up to $32,500 for violations after March 15, 2004.

FOURTH CLAIM FOR RELIEF
(SIP Violations)

86.  From at least 1987 and continuing to the present time, Perma-Fix failed to apply for and obtain Permits to Install

prior to installing various new emission sources at its Dayton facility, including, without limitation, sources that are part of the used oil and wastewater operations in Buildings B and G, in violation of Ohio Admin. Code 3745-31-02.

87. From November 2000 and continuing to the present time, Perma-Fix failed to apply for and obtain PTIs prior to installing various new emission sources at the Bioplant, in violation of Ohio Admin. Code 3745-31-02.

88. Unless restrained by an order of this Court pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), Perma-Fix will continue to violate applicable provisions of the Ohio SIP.

89. Pursuant to Section 114(b) of the Act and 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, Perma-Fix is subject to civil penalties for each violation in the preceding paragraphs occurring less within five years before filing of this Complaint. Penalties for these violations are up to $27,500 per day for violations occuring through March 15, 2004 and up to $32,000 per day for each violation occurring after March 15, 2004.

### FIFTH CLAIM FOR RELIEF
(Section 114 Request)

90. From October 3, 2003 to January 14, 2004, Perma-Fix failed to respond to a July 26, 2003 information request issued by U.S.EPA, in violation of Section 114(a) of the Act, 42

- 21 -

U.S.C. § 7414(a).

91. For the violations referred to in the preceding paragraph, pursuant to Section 113(b) of the Act, Perma-Fix is subject to civil penalties of up to $27,500 a day.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Intervenor United States respectfully requests that this Court:

1. Enjoin Perma-Fix to take all action necessary to come into and maintain compliance with the Clean Air Act, the OSWRO NESHAP, the applicable provisions of the general NESHAP and State Operating Permit Program regulations and Rule OAC 3745-31-02 of the Ohio SIP.

2. Assess civil penalties of up to $27,500 per day for each violation by Perma-Fix of the Clean Air Act and the applicable regulations through March 15, 2004 and up to $32,500 per day for each violation after March 15, 2004.

3. Grant such other and further relief as the court may deem appropriate.

Respectfully submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources
Division

- 22 -

MIRIAM L. CHESSLIN
Trial Attorney
Environment and Natural Resources
  Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044-7611
(202) 514-1491
e-mail:  mimi.chesslin@usdoj.gov

FRANCIS J. BIROS
Trial Attorney
Environment and Natural Resources
  Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044-7611
(202) 616-6552
e-mail: frank.biros@usdoj.gov


GREGORY G. LOCKHART
United States Attorney
Southern District of Ohio

/s/ Patrick Quinn by MLC (by permission)

PATRICK QUINN
Assistant United States Attorney
Room 602 Federal Building
200 W. 2d Street
Dayton, Ohio 45402
(937)225-2910
e-mail: patrick.quinn@usdoj.gov


Of Counsel
Luis Oviedo
Assistant Regional Counsel
U.S. Environmental Protection
Agency, Region V


- 23 -